NEW FALLS CORPORATION,
     Plaintiff,

v.

EDWARD N. LERNER,
     Defendant.

CIVIL ACTION NO.
3:05cv1716 (SRU)

## RULING ON MOTION FOR SUMMARY JUDGMENT

This case arises out of defendant Edward Lerner's alleged legal malpractice during his representation of Matsco Companies ("Matsco") in its enforcement of a financing, lease and security agreement with Alvin B. Olesh and Patricia Olesh. As assignee of Matsco's rights under those loan and equipment leasing agreements, plaintiff New Falls Corporation ("New Falls") filed a legal malpractice suit against Lerner for his failure to perfect an attachment against the Oleshes' real property. Lerner seeks summary judgment on the ground that the legal malpractice claim was not transferred by the assignment agreement, or in the alternative, that California law, which expressly governs the assignment agreement, prohibits the assignment of legal malpractice actions. At the motion hearing held on November 29, 2007, I converted Lerner's motion to dismiss to a motion for summary judgment and requested supplemental briefing on the issues of: (1) New Falls' legal theory on how it obtained the right to bring suit against Lerner for legal malpractice and, (2) in the event that New Falls did obtain the right to pursue that claim, which state's law governs the effect of that transfer. Because I conclude California law, with its well-established prohibition on the assignability of legal malpractice claims, governs the issue of assignability, Lerner's motion is granted.

## I. Facts

In November 1999, Alvin Olesh executed a master equipment financing, security, and lease agreement with Matsco, borrowing approximately $675,000.00 and leasing certain equipment for his dental practice. His wife, Patricia Olesh, guaranteed those obligations, contemporaneously executing a guaranty and a commercial pledge and security agreement with Matsco (collectively, the "Olesh Loan Agreements"). The Oleshes subsequently defaulted on those agreements. Matsco, through Lerner, filed suit in March 2002 against the Oleshes in the United States District Court for the District of Connecticut (hereinafter the "Matsco Action").

In connection with that suit, Lerner, on behalf of Matsco, filed an application for prejudgment remedy against the Oleshes, seeking an attachment in the amount of $927,250.10 on the Oleshes' real property located in Wilton, Connecticut. In November 2002, the court entered an order, based on a stipulation between Matsco and the Oleshes, which provided for a $500,000 prejudgment attachment against the Oleshes' Wilton property. According to New Falls, Lerner subsequently failed to take the proper steps under Connecticut General Statutes § 52-285 to perfect that attachment.

In January 2003, Matsco assigned all of its right, title and interest in and to the assets underlying the Matsco Action, including the Matsco Action itself, to Stornawaye Capital, LLC ("Stornawaye"). As a result of the assignment, Stornawaye was substituted as a plaintiff in the Matsco Action. New Falls alleges that Lerner continued to represent Stornawaye in that action, which Lerner does not concede. According to the docket sheet for the Matsco Action, 3:02cv452 (AWT), Lerner was Stornawaye's only counsel of record during the pendency of that suit.

On September 15, 2003, while the Matsco Action remained pending, Patricia Olesh filed

for bankruptcy in the United States Bankruptcy Court for the District of Connecticut (hereinafter the "Olesh Bankruptcy").  As a result of that bankruptcy petition, on September 23, 2003, the court in the Matsco Action dismissed the case without prejudice to its pursuit in the bankruptcy court.  In December 2003, Stornawaye filed a Proof of Claim in the Olesh Bankruptcy action in the total amount of $865,563.22, stating that its claim was secured by real estate collateral.

In February 2004, Stornawaye assigned to New Falls all of its right, title and interest in and to the assets underlying the Matsco Action.  The assignment was evidenced by a Loan Purchase Agreement, and the terms and conditions of the assignment were set forth in a General Assignment (collectively, the "Assignment Agreement").  Each document expressly stated that its terms were to be governed by the law of California.  New Falls subsequently filed a Notice of Transfer of Proof of Claim and a Notice of Filing of Assignment of Claim in the Olesh Bankruptcy.

On April 12, 2005, the trustee in the Olesh Bankruptcy sold the Wilton property for $1,600,000.00, free and clear of all liens.  All interests, claims, and liens on that property – including the Matsco Action prejudgment attachment – were transferred to the proceeds of the sale with the same validity and to the same extent and order of priority they had against the real property.  On June 8, 2005 the trustee of the Olesh bankruptcy estate commenced an Adversary Proceeding against New Falls to avoid the prejudgment attachment pursuant to 11 U.S.C. § 544(a)(1), (2), and (3) on the basis that it was never validly perfected as required under Connecticut law.  New Falls filed the pending suit against Lerner for legal malpractice in November 2005.

## II.    Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"), *cert. denied*, 506 U.S. 965 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991), *cert. denied*, 502 U.S. 849 (1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## III.    Discussion

In order to survive the pending motion for summary judgment, New Falls must demonstrate: (1) that it has a viable right to pursue a legal malpractice claim against Lerner as assignee of Stornawaye's rights, title and interest in the assets underlying the Matsco Action; (2) why California law, as the express choice of law in the Assignment Agreement, does not govern the assignability of a legal malpractice under that agreement; and (3) that Connecticut law would permit the enforcement of the legal malpractice claim in this case.

A.     Could Stornawaye Assign the Legal Malpractice Claim to New Falls?

New Falls concedes that it never had a direct attorney-client relationship with Lerner and that its right to the claim is derived solely from its assignment agreement with Stornawaye. Therefore, the threshold issue is whether the legal malpractice claim was assignable – that is, assuming that Stornawaye possessed the right to pursue a legal malpractice claim against Lerner in the first place, was it legally possible for Stornawaye to transfer that right to New Falls?[1]  The parties dispute which state's law should govern the question of assignability.[2]  New Falls does not dispute that California law governs the issue whether the Assignment Agreement's contractual language is broad enough to encompass a claim for legal malpractice.  Nevertheless, it maintains that Connecticut law governs the question of assignability because the claim arose under Connecticut law and Connecticut has a more substantial interest in having its law applied to the claim, which involves a Connecticut-licensed attorney allegedly committing malpractice during his representation of a party in Connecticut court.  Lerner argues that California law must apply to the issue of assignability because it is the express choice of law governing the assignment agreement between Stornawaye and New Falls, which is the sole source of New Falls' substantive right to the claim.

---

[1] Whether Stornawaye *actually* possessed this right – which Lerner disputes – only becomes pertinent if it is was legally permitted to transfer that claim to New Falls.  If it did not have the ability to assign the claim as a matter of law, I need not reach the issue of how Stornawaye acquired that right, if at all.

[2] Assignability addresses the issue whether a party can legally transfer a right to another party under the applicable law.  *See* Restatement (Second) of the Conflict of Laws, § 208, cmt. a (1971) ("The law selected by application of the rule of this Section determines whether a contractual right not embodied in a document can be effectively assigned . . . .").

1. *Choice of Law*

Because the parties dispute which state's law applies to the question of assignability, I must resolve the choice-of-law issue. A federal court sitting in diversity must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Under Connecticut choice-of-law rules, Connecticut courts will give effect to the parties' contractual choice-of-law provisions. *See, e.g., Elger v. Elger*, 238 Conn. 839, 848 (1996) (noting that Connecticut courts "have given effect to an express choice of law by the parties to a contract provided that it was made in good faith"). Explicitly adopting the language of section 187 of the Restatement (Second) of Conflict of Laws, the Connecticut Supreme Court in *Elger* held that "[p]arties to a contract generally are allowed to select the law that will govern their contract, unless either: '(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'" *Id.* at 850 (quoting Restatement (Second) of Conflict of Laws, § 187 (1971)).

Section 10.11 of the Stornawaye-New Falls Loan Purchase Agreement states that "[t]his Agreement shall be construed, and the rights and obligations of the Seller and Buyer hereunder determined, in accordance with the law of the State of California." The accompanying General Assignment states that it, too, "shall be governed by the laws of the State of California." Therefore, applying Connecticut choice-of-law rules, I conclude that California law governs the

assignability of the legal malpractice claim.[3]

## 2. *Assignability of Legal Malpractice Claims Under California Law*

Under California law, courts will broadly construe language purporting to assign or transfer "all right, title, and interest to" the underlying assets. "An unqualified assignment of a contract or chose in action . . . vests in the assignee the assigned contract or chose and all rights and remedies incidental thereto." *Nat'l Reserve Co. of America v. Metro. Trust Co. of Cal.*, 17 Cal. 2d 827, 830, 832-33 (1941) (concluding that all right, title and interest in the property were transferred without limitation where the assignment agreement contained the language "all his right, title and interest of, in and to"). In California "the broad rule of assignability" arises out of the "basic public policy that '[a]ssignability of things in action is now the rule; nonassignability the exception.'" *Goodley v. Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 393 (Cal. Ct. App. 1976) (quoting *Rued v. Cooper*, 109 Cal. 682, 693 (1893)).

Similarly, the Assignment Agreement's language reflects an unambiguous intent to transfer all Stornawaye's right, title, and interest in the Olesn Loan Agreement. The General Assignment executed between Stornawaye and New Falls on February 19, 2004 states, in pertinent part, under the heading "Assignment" in paragraph (b):

> [Stornawaye] hereby sells, assigns, transfers and conveys to [New Falls], without any representation, warranty or recourse other than as specifically provided for in the Purchase Agreement, all of [Stornawayes's] right, title and interest in and to all of the notes and the Loans evidenced by the notes, including any and all guaranties and collateral and other security for the Loans as described in Exhibit A hereto.

---

[3] Without addressing the disputed issue of their admissibility, I note that even the corrective agreements submitted with New Falls' Supplemental Memorandum of Law do not change the California choice-of-law provision.

The Loan Purchase Agreement, executed between Stornawaye and New Falls on February 19, 2004, defines "Loan" as "those certain loans more particularly described in the loan schedule attached hereto as Schedule 1 (the "Loan Schedule"), including all Claims and all Proceeds arising therefrom." The Purchase Agreement further defines "Claim" as:

> any claim, demand, assertion, legal proceeding, cause of action (whether tort, contract or any other basis), loss, penalty, fine, forfeiture, judgment, order or decree in any legal or administrative proceedings (including without limitation, bankruptcy and foreclosure proceedings), and any legal or other fees, court or other costs, liability, damage, or expense, whether any of the above are known or unknown, fixed or contingent.

The express terms of the assignment agreement between Stornawaye and New Falls appear to be broad enough to include a legal malpractice claim arising out of the Olesh Loan Agreement and the accompanying enforcement action. The Purchase Agreement very specifically transfers not only Stornawaye's rights to the loan itself, but any claim arising out of that loan agreement, including tort actions. The legal malpractice tort claim against Lerner reasonably arises out of the Olesh Loan Agreement because it allegedly occurred during Lerner's representation of Matsco and Stornawaye in the enforcement action against the Oleshes and his alleged negligence had a direct impact on the lender's, and its subsequent assignees', ability to collect against the Oleshes for their default on those loan agreements.

However, although the parties may have *intended* to transfer all remedies and rights incidental to the Olesh Loan Agreements, it does not necessarily follow that they legally did so. One key exception to California's broad rule of assignability is its prohibition on the assignment of legal malpractice claims. *Jackson v. Rogers & Wells*, 210 Cal. App. 3d 336, 341-42 (Cal. Ct. App. 1989) (citing *Goodley*, 62 Cal. App. 3d at 393-95); *see also Kracht v. Perrin, Gartland &*

*Doyle*, 219 Cal. App. 3d 1019, 1023 (Cal. Ct. App. 1990) ("It is now well settled that under California law a former client may not voluntarily assign his claims for legal malpractice against his former attorneys."). Noting the often highly personal nature of the attorney-client relationship with its attendant duty of confidentiality, the *Goodley* court held that it would violate important considerations of public policy to permit parties to assign their legal malpractice claims. *Goodley*, 62 Cal. App. 3d at 397. To allow clients to assign their legal malpractice claims would be to "convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty . . . . The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession." *Id.* Not only did the court fear that attorneys could be forced "to defend themselves against strangers," but that permitting the assignability of legal malpractice actions would overburden the judicial system, "restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client." *Id.*

Since *Goodley*, California courts have repeatedly rejected the opportunity to narrow or overturn the prohibition on assignability of legal malpractice suits. *See, e.g., Kracht*, 219 Cal. App. 3d at 1024 (applying prohibition on assignability to legal malpractice claims assigned involuntarily by court order); *Baum v. Duckor, Spradling & Metzger*, 72 Cal. App. 4th 54, 68-72 (Cal. Ct. App. 1999) (holding that a bankruptcy trustee had no right to assign the bankruptcy estate's legal malpractice claims to creditors "as a matter of California law and sound public policy").

-10-

Furthermore, at least one California court has applied the prohibition on assignability of legal malpractice claims in suits brought against out-of-state attorneys. In *Kracht*, a judgment creditor obtained a court order compelling the assignment to it of all the judgment debtor's choses in action against his attorneys. 219 Cal. App. 3d at 1021. The judgment debtor's attorneys were licensed to practice in Oregon and had allegedly committed legal malpractice in California courts by engaging in the unauthorized practice of law and by rendering substandard and inaccurate legal advice that resulted in the judgment against their client. *Id.* The judgment creditor subsequently filed a claim for legal malpractice against the Oregon attorneys on the basis of the court-ordered assignment. *Id.* 1021-22. Notwithstanding the fact that a California court had ordered the assignment of the legal malpractice claims, the appellate court concluded that, due to the public policy concerns expressed in *Goodley* and *Jackson*, California law precludes all assignments of legal malpractice claims, whether done voluntarily or involuntarily. *Id.* at 1025. Any possible public policy concerns about protecting the integrity of the California courts against the unauthorized and negligent practice of law by out-of-state attorneys were not significant enough to outweigh the public policy concerns presented by the assignment of legal malpractice claims, which could "debase the legal profession" by encouraging unjustified lawsuits, burdening the judicial system, and promoting champerty. *Id.* at 1023.

Because any attempt to assign a legal malpractice claim by a contract governed by California law is rendered void on the basis of California's emphatic public policy prohibiting the assignment of legal malpractice claims, Stornawaye's attempt to transfer its legal malpractice claim against Lerner to New Falls was ineffective as a matter of law. It is irrelevant whether

Stornawaye *intended* to transfer the legal malpractice claim to New Falls or not.[4]  Stornawaye's

attempt to transfer its legal malpractice claim was void on the basis of California public policy;

the transaction was barred at the outset so that the transfer of the legal malpractice claim never

occurred.  New Falls is not, nor ever was, in possession of a legal malpractice claim against

Lerner and therefore, lacks legal standing to pursue its present suit against Lerner.

      B.      <u>New Falls' Objections to the Application of California Law</u>

New Falls vehemently opposes the application of California law to the question of

assignability, arguing that the validity of assignment must be determined by the substantive law

of the jurisdiction whose law governs the underlying legal malpractice claim, here, Connecticut.

However, New Falls has not sufficiently explained why this court should overlook the

Connecticut choice-of-law rule that dictates courts should give effect to express choice-of-law

provisions.  Without acknowledging that Connecticut applies that choice-of-law rule, New Falls

skips immediately to the argument that Connecticut has a more substantial relationship than

California to the underlying claim because it arose under Connecticut law.  That conclusion,

however, ignores the fact that, although the underlying malpractice claim may sound in tort, New

Falls' right to sue on that claim is derived completely from the Assignment Agreement with

Stornawaye.  Without that Assignment Agreement, New Falls would not have the ability to raise

a legal malpractice against Lerner under any law, let alone Connecticut law.  Logic therefore

---

[4] I am assuming for present purposes that the language of the original Stornawaye-New
Falls' Loan Purchase Agreement and General Assignment was broad enough to theoretically
include the claim for legal malpractice against Lerner.  Therefore, it is not necessary to consider
the corrective agreement submitted by New Falls' as Exhibit D to its Supplemental
Memorandum in Opposition to Defendant's Motion to Dismiss, which explicitly states it is the
parties' intention to transfer any and all claims for professional malpractice.

dictates that the issue whether a particular right was transferred or not under the Assignment Agreement is a matter of contractual interpretation. To resolve an issue of contract interpretation by applying the law of the state where the underlying tort claim arose rather than the express choice of law governing that contract would disappoint the expectations of the parties. The issue is not, as New Falls argues, whether *Lerner's* expectations would be protected or disappointed by the application of Connecticut law, but rather whether New Falls should be held to its choice of law in the Assignment Agreement. Despite having expressly agreed to abide by the choice of California law as a party to the Assignment Agreement, New Falls would have this court circumvent its express choice of law to confer upon it a right greater than that contemplated by the four corners of the contract, *i.e.*, a right to pursue a legal malpractice against Lerner, which would only arise if Connecticut law, and not California law, applied to the issue of assignability.

Connecticut choice-of-law rules notwithstanding, New Falls maintains that case law supports its argument that courts, when analyzing issues of assignability in connection with legal malpractice claims, apply the substantive law of the state where the alleged malpractice occurred, not the choice-of-law provision in the assignment agreement. New Falls relies primarily on *RTC Mortgage Trust 1994 N-1 v. Fidelity National Title Insurance Co.*, 16 F. Supp. 2d 557 (D.N.J. 1998), which analyzed the assignability of legal malpractice claims in a factual scenario similar to this case. I do not find *RTC Mortgage* to be persuasive because it contains almost no legal analysis regarding how the court reached that conclusion, which is dicta.

Using the parties' express choice-of-law provision, the *RTC Mortgage* court first determined that, under New York law, the assignment's language was broad enough to encompass a legal malpractice claim. *Id.* at 564. The court next determined, without setting

forth any explanation for its conclusion, that New Jersey law would govern the question of assignability if New Jersey law governed the substantive legal malpractice claim.[5]  *Id.* at 565 n.6. Under New Jersey choice-of-law rules, the court concluded that New Jersey law would govern the underlying substantive claim because the claim involved New Jersey-licensed attorneys who rendered an incorrect opinion about the operation of New Jersey law for a New Jersey client.  *Id.* The court thus concluded that New Jersey law, which prohibited the assignment of legal malpractice claims, governed the issue of assignability.  *Id.*  Crucially, however, after concluding that New Jersey law would apply to the issue of assignability, the court went on to hold that federal law preempted state law on the question of assignability, thus rendering the choice-of-law issue moot.  *Id.* at 567.

      The *RTC Mortgage* court cited the decision in *Conopco, Inc. v. McCreadie*, 826 F. Supp. 855 (D.N.J. 1993), for its conclusion that the law governing the underlying substantive tort claim should also govern the issue of assignability.  New Falls also relies on *Conopco* to support its argument that the substantive law of the state where the tort claim arose should govern the

_____

     [5] The court used the term "validity" in its discussion of whether New Jersey permits the assignment of legal malpractice claims.  *Id.* at 565 n.6.  However, I understand the court to mean "assignability" rather than "validity of an assignment," based on its subsequent analysis of that issue.  "Assignability" and "validity of an assignment" mean two distinct things according to the Restatement. While assignability refers to "whether, and under what conditions" a contractual right can be effectively assigned, *see* Restatement (Second) Conflict of Laws § 208 cmt. a, the "validity an assignment" refers to whether that transfer was executed properly under applicable law, for example, whether the proper formalities have been complied with or whether the transferor had legal capacity to make an assignment, *see* Restatement (Second) Conflict of Laws § 209 cmt a.  Because the *RTC Mortgage* court appears to be discussing whether New Jersey law would permit a party to transfer its legal malpractice claim to another party as a matter of law, and not whether the party had properly executed the assignment agreement, I take the court to mean "assignability" when it analyzes "the validity of assignment."  *RTC Mortgage*, 16 F. Supp. 2d at 565 n.6.

assignability of that claim. Although it is true that the *Conopco* court concluded that "the assignability of the tort claims must be governed by the law of the state which would govern the substantive malpractice and professional negligence claims," as I explain below, I do not find the reasoning that guided the court's decision to be especially persuasive.

In *Conopco*, the court was asked to decide which state's law governed the assignability of a professional malpractice claim – the law of the assignment agreement, New York, or the law of the state where the tort claim arose, New Jersey. *Id.* at 864. The court recognized the assignment agreement had an express choice-of-law provision and that New Jersey choice-of-law rules followed section 187 of the Restatement (Second) of Conflict of Laws, which dictates that courts should give effect to the parties' contractual choice of law. *Id.* The court next acknowledged the distinction between the "validity of an assignment" and "the general assignability of a tort chose in action," noting that assignment presents two questions: the inherent assignability of the claim and the validity and effect of the assignment. *Id.* It then analyzed sections 208 and 209 of the Restatement, stating "the *assignability* of a right arising out of a contract is to be governed by the law which would govern the contract generally. By contrast . . . the *validity* of the assignment of a contract right . . . is to be governed by the law of the state with the most significant relationship 'to the assignment and the parties.'" *Id.* at 865 (quoting Restatement (Second) Conflict of Laws § 209). The court concluded that the law of the state with the most significant relationship to the assignment itself would govern the "validity of an assignment;" however, the "assignability" of that right would be governed by "the law from which the chose in action itself springs." *Id.* Thus, the court concluded, the law of New Jersey would govern the assignability of the professional negligence claim because that was where the claim arose.

-15-

I disagree with that final leap of logic, which I believe fundamentally mischaracterizes the nature of the rights involved in this case. It is true that section 208 of the Restatement states that "whether, and under what conditions, a contractual right, which is not embodied in a document, can be effectively assigned is determined by the local law of the state which has the most significant relationship to the contract and the parties with respect to the issue of assignability." I disagree that this means that a choice-of-law provision in an assignment agreement should be summarily ignored in favor of a determination of which state had the most significant relationship to the underlying claim, as the *Conopco* court appears to have concluded. Indeed, comment b to section 208 states, using section 6 of the Restatement as a guide, that "[t]he state whose local law governs the issue of assignability will usually, but not necessarily, also be the state whose local law would be applied to determine other issues relating to the contract." Section 6 states that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) of the Conflict of Laws § 6(1). Only when there is no such directive should a court consider the following factors when determining which state's law is applicable: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." I believe a more reasonable reading of section 208, in conjunction with section 6, is that the forum state's choice-of-law rules should take precedence before the court engages in an analysis of other relevant factors. Therefore, because Connecticut

has adopted section 187 of the Restatement, the applicable law is the one chosen by the parties.

To support its conclusion that the law where the underlying claim arose is the law that governs the issue of assignability, the *Conopco* court reasoned that parties should not be permitted to "create rights of assignability beyond those permitted by the law of the state in which the cause of action arose simply by entering into a contract of assignment in a state whose law recognizes the assignability of the chose in action." 826 F. Supp. at 865. The *Conopco* court did not explain why that policy consideration meant that courts should automatically jump to the law governing the underlying claim on the issue of assignability rather than first working through established choice-of-law rules in order to determine whether the choice-of-law provision should be applied or not. In my opinion, that policy concern raised by the *Conopco* court is reasonably protected by the public policy exception under section 187: that the parties' contractual choice of law may be disregarded where its application would violate the public policy of the state whose law would apply in the absence of the-choice-of law provision. Restatement (Second) of Conflict of Laws § 187(2)(b).[6]

Finally, contrary to the *Conopco* court's conclusion that the law of the state where the underlying claim arose should govern the issue of assignability because it is that law "from which the chose in action itself springs," I believe the law of the assignment agreement has the closer relationship to the issue of assignability. Without the assignment agreement, the assignee would never have the right to pursue the claim in the first place. If the law that the parties chose to govern the rights and obligations transferred under the assignment agreement did not permit the

---

[6] The *Conopco* court did acknowledge the existence of a public policy exception in section 187, noting that it might be an alternative reason for disregarding the choice of New York law. It concluded, however, that it did not need to reach that issue. 826 F. Supp. at 866 n.4.

transfer of a particular claim or right as a matter of law, it is unnecessary to reach the issue

whether that transfer would violate the fundamental public policy of the state where the

underlying claim arose.  If the assignment agreement, by its own terms, could not have

contemplated the transfer of a particular claim, then the issue how the law of the state where the

underlying claim arose would treat the issue of assignment need never be reached.

Where parties choose to transfer rights under the law of a state that has a well-known

prohibition on the assignment of certain rights and claims, it is a bit difficult for one of those

parties to then claim it should have that claim assigned to it because the law of the state where

the claim arose would permit such a transfer.  Parties choose to contract away rights that would

otherwise be afforded to them in consideration for other benefits all the time.  Merely because the

law of the state where a claim arose is more permissive than the law expressly agreed upon by

the parties to govern their assignment is not a sufficient reason to void that choice of law and

restore those rights, absent the circumstances recognized by section 187 of the Restatement.

Therefore, I do not find the *Conopco* court's conclusion that the law of the state where the

underlying claim arose should automatically govern the issue of assignability to be persuasive.

Instead, I believe the choice-of-law rules of the forum state should take precedence when

determining which state's law is applicable to the question of assignability.

Thus, I decline to follow New Falls' suggestion that I disregard Connecticut's established

choice-of-law rules and jump immediately to the conclusion that the substantive law governing

the underlying claim should control the issue of assignability.  Accordingly, under Connecticut

choice-of-law rules, California law governs the issue of assignability unless New Falls can

demonstrate that either: "(a) the chosen state has no substantial relationship to the parties or the

transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Elger*, 238 Conn. at 850 (internal quotations omitted) (quoting Restatement (Second) of Conflict of Laws § 187).

        1.     *California Has a Substantial Relationship to the Parties and Transaction*

Because California has a substantial relationship to both the parties and the transaction, New Falls cannot establish the first exception under section 187. Stornawaye is a California corporation and the underlying Olesh Loan Agreements are also to be construed in accordance with California law. As an Ohio corporation, New Falls has no closer relationship to Connecticut than it does to California, whose law it expressly agreed would govern the terms of the Assignment Agreement. If New Falls did not want California law to apply to certain rights and claims, it was in a position to negotiate for a more limited or different choice-of-law provision. Because California law has been the contemplated choice of law for all parties with former and present interest in the Loan and Assignment Agreements at the heart of this lawsuit, I conclude there is a substantial relationship between the chosen state, California, and the parties and the transaction. Therefore, New Falls cannot show that California has "no substantial relationship to the parties or transaction" so as to avoid the choice-of-law provision in the Assignment Agreement.

2. *Applying California Law is Not Contrary to Connecticut Public Policy*

Assuming, *arguendo*, that Connecticut law would apply in the absence of the choice of law provision, it would not violate a fundamental policy of the state of Connecticut to apply California's prohibition on the assignability of legal malpractice claims in this case.  It is true that the Connecticut Supreme Court recently declined to adopt a per se rule prohibiting the transfer of legal malpractice claims.  *Gurski v. Rosenblum & Filan, LLC*, 276 Conn. 257, 277 (2005) (rejecting a per se rule precluding the voluntary assignment of legal malpractice claims).  However, the court in *Gurski* did prohibit the transfer of certain legal malpractice claims, specifically where a client seeks to transfer its claim to an adversary in the underlying litigation.  *Id.* at 279-80.  Therefore, having declined to legalize the transfer of legal malpractice claims in at least one factual scenario, it cannot be said that Connecticut so strongly *supports* the transferability of legal malpractice claims so that applying California's prohibition on the practice would violate a fundamental policy of the state.  Furthermore, even though it declined to institute a per se ban on assignability, it does not necessarily follow that the Connecticut Supreme Court would support the transferability of legal malpractice claims under the facts presented here.  Therefore, in the absence of a strong policy statement on the assignability of legal malpractice claims, it does not violate Connecticut public policy to apply California law in this case, including its prohibition on the assignability of legal malpractice claims.

Because New Falls has failed to demonstrate how either of the two exceptions under section 187 would apply in this case, I conclude that California law governs the issue of assignability.  The difficulty New Falls seeks to avoid is of its own creation – as a party to the Assignment Agreement, it explicitly agreed that California law would govern how its rights and

obligations under the agreement were to be construed.  Because California law prohibited

Stornawaye's transfer of its legal malpractice claim to New Falls at the outset, New Falls never

possessed that right in the first place.  Therefore, it has no standing to pursue a claim for legal

malpractice against Lerner.

IV.     **Conclusion**

For the foregoing reasons, Lerner's motion to dismiss (**doc. #53**), converted to a motion

for summary judgment, is **GRANTED**.  The clerk is directed to close the file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 26th day of September 2008.

/s/ Stefan R. Underhill_____
        Stefan R. Underhill
        United States District Judge